[No. D061946. Fourth Dist., Div. One. July 22, 2014.]

THE PEOPLE, Plaintiff and Respondent, v.
LEOPOLDO CHAVEZ et al., Defendants and Appellants.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts I through V and VII of the Discussion.

## COUNSEL

Kimberly J. Grove, under appointment by the Court of Appeal, for Defendant and Appellant Leopoldo Chavez.

Laura G. Schaefer, under appointment by the Court of Appeal, for Defendant and Appellant Edward Elias.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Annie Featherman Fraser, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BENKE, Acting P. J.**—A jury convicted defendants and appellants Leopoldo Chavez and Edward Elias of two counts of first degree murder (Pen. Code, § 187, subd. (a))[1] and found true the special circumstances of robbery murder (§ 190.2, subd. (a)(17)) and multiple murders (§ 190.2, subd. (a)(3)). The jury further found that Chavez and Elias were armed with a firearm within the meaning of section 12022, subdivision (a)(1). Following their convictions, the court sentenced Chavez and Elias to two consecutive terms of life imprisonment each, without the possibility of parole, plus an additional consecutive year. The court later recalled the sentences to consider whether to impose a lesser punishment under section 190.5, subdivision (b), because Chavez and Elias were under the age of 18 at the time of their offenses. After a further hearing, the court declined to modify the sentences.

Chavez and Elias appeal, contending that the evidence was insufficient to convict them of first degree murder or to support the special circumstance findings. They further contend that (1) the court erred in instructing the jury using a modified version of CALCRIM No. 376, (2) the court erred by not instructing the jury regarding the natural and probable consequences doctrine, (3) the prosecutor committed prejudicial misconduct during closing arguments, (4) the sentences of life imprisonment without the possibility of parole

---

[1] Further statutory references are to the Penal Code unless otherwise noted.

violate the Eighth Amendment of the United States Constitution because they were juveniles at the time of their offenses, and (5) the court erred by imposing parole revocation fines.

With two exceptions, we reject defendants' contentions on appeal. As we set forth more fully below, the 20- and 23-year-old victims were sailors enlisted in the United States Navy, one of whom was driving a brand new Toyota pickup truck. The victims were murdered at a location where young adults, including other Navy personnel and their friends, frequently gathered to drink, listen to music and socialize around a number of bonfires. Multiple witnesses recalled that Chavez, who was 17 at the time of the killings, was at the scene of the bonfires shortly before the murders took place. The witnesses also uniformly recalled that Chavez was in the company of at least one other teenager or young adult and that Chavez and his companion were acting in a very aggressive and threatening manner toward other Navy personnel and their friends present at the bonfires. Four days after the murders, Chavez was stopped in Tijuana, Mexico, while driving the 20-year-old victim's new Toyota pickup truck. Importantly, some years after the murders, investigators were able to match DNA retrieved from the pants pocket of the 20-year-old victim with Chavez's DNA.

The witnesses' identification of Chavez as being present at the bonfires shortly before the murders, his possession of the truck following the murders, and his DNA in the pants pocket of one of the victims, make a strong case Chavez participated in the truck robbery and the killings.

With respect to Elias, who was also 17 at the time of the murders, the record is sufficient to sustain his conviction and the special circumstance findings. Within just a few hours after the killings, investigators found a cigarette butt at the scene of the murders among items that had been taken out of the Toyota truck. Later, investigators were able to match DNA on the cigarette butt with Elias's DNA. Elias's DNA was also found on a cup recovered from inside the victim's truck when it was stopped in Tijuana after the murders. In addition to the DNA on the cup, Elias's fingerprints were found both on the inside and outside of the truck.

The cigarette butt Elias left at the scene of the murders, with ash still attached, very near items discarded from the truck and recovered very shortly after the murders, places Elias at that location at or near the time of the murders. Elias's DNA, found in the cup retrieved from the truck, and his fingerprints, found both on the inside and outside of the truck, place Elias in the truck with Chavez shortly after the time it was stolen and near the time of the killings. These circumstances support the conclusion Elias was Chavez's companion at the bonfires and an active participant in the robbery and killings.

Thus, there is sufficient evidence to support Chavez's and Elias's murder convictions as well as the jury's felony-murder and multiple-murder special-circumstances findings. We also reject defendants' claims that they were prejudiced by instructional error and that the prosecutor engaged in misconduct.

Because defendants were sentenced before *Miller v. Alabama* (2012) 567 U.S. ___ [183 L.Ed.2d 407, 132 S.Ct. 2455] (*Miller*) and *People v. Gutierrez* (2014) 58 Cal.4th 1354 [171 Cal.Rptr.3d 421, 324 P.3d 245] (*Gutierrez*) were decided and, because the record here does not show that the trial court had the opportunity to directly consider the ultimate issue presented in those cases, we reverse the life sentences without possibility of parole and remand for resentencing in light of *Miller* and *Gutierrez*. We also agree the trial court erred in imposing parole revocation fines.

## FACTS

### A. *The Palms Bonfires*

Early in the autumn of 1993, a large area of undeveloped land located near the intersection of Interstate 805 and Palm Avenue in southern San Diego County was known as "the Palms." The Palms was for the most part barren dirt and, on a fairly regular basis, it was the site of multiple simultaneous bonfires attended by various groups of young adults. Navy personnel and their friends who frequented a country and western club located on a local Navy base, Anchors and Spurs, often met at the Palms after Anchors and Spurs closed for the night and socialized together around one or more of the bonfires.

On the night of September 24, 1993, a number of people from Anchors and Spurs attended a party at the Palms where there were two Anchors and Spurs bonfires. Witnesses estimated that the number of attendees ranged from 20 to 50 people. At the party, people smoked cigarettes, drank beer, and mingled. It was very foggy.

Two United States Navy sailors, 23-year-old Keith Combs (Combs) and 20-year-old Eugene "Cliff" Ellis (Ellis), were present at the Anchors and Spurs bonfires. Both young men carried wallets, base passes and military identification. Combs smoked Marlboro cigarettes exclusively.

That night, Ellis drove a brand-new white Toyota pickup truck, which he had recently purchased with financial help from his father. Ellis's truck had fewer than 1,000 miles on the odometer. Ellis and Combs arrived at the Palms with two other sailors at approximately 7:30 p.m. but went back to

their base with their two companions around 11:00 p.m. Once back at the Navy base, Ellis and Combs decided to return to the Palms. When they returned to the party, Ellis parked his truck with the back bumper facing one of the Anchors and Spurs bonfires.

### B. *Aggressive and Uncomfortable Behavior*

During the hour between 4:00 a.m. and 5:00 a.m., members of the Anchors and Spurs party had experiences ranging from uncomfortable to distressing at and near where Ellis parked his truck.

#### 1. *Behmke*

About 4:00 a.m., Barbara Behmke drove an Anchors and Spurs partygoer to the Balboa Naval hospital. Behmke's acquaintance had been in a fight at one of the bonfires and was bleeding. Behmke stayed at the hospital for a short period but returned to the Palms to look for a friend and find a jacket she had left at one of the bonfires. When Behmke returned to the site of the bonfires, she encountered four young Hispanic males. Two of the young men approached her. Behmke was later able to identify Chavez as one of the two young men. Chavez made sexual gestures and remarks that made Behmke very uncomfortable. According to Behmke, in response to her uncomfortable encounter with Chavez and his companion, she got in her truck and immediately left the area.

#### 2. *Duvall*

Justin Duvall was also an enlisted member of the Navy and at the Anchors and Spurs bonfires on the morning of September 25, 1993. Around 5:00 a.m., two teenagers approached Duvall.[2] Duvall was later able to identify Chavez as one of the two teenagers who approached him. The pair asked Duvall for beer. One of the two teenagers had his hand behind his back in a manner that Duvall felt was very threatening. When Duvall declined to give them beer, Chavez and his companion responded "you fucking cowboys, we don't like your music." After Chavez and his companion returned to their own bonfire, Duvall immediately left the Palms with his friends. According to Duvall, he left immediately after his encounter with Chavez and his companion because: "I felt uncomfortable. I knew something wasn't right. That's when I decided we better leave."

#### 3. *Forde*

Stephen Forde was parked next to, and within four to five feet of, Ellis's truck at the Anchors and Spurs bonfire. On that evening, Forde was 18 years

---

[2] A third teenager was with the other two before any words were exchanged, but he did not approach Duvall.

old and, like Combs and Ellis, an enlisted member of the Navy. Forde was concerned about and keeping an eye on a friend who was somewhat intoxicated. Forde noticed two teenage males, one of whom he was able to identify as Chavez, sitting in a vehicle about 15 feet outside the circle of cars at the Anchors and Spurs bonfire. Chavez and his companion caused Forde to be concerned. They were laughing, and something about their mannerisms made Forde feel that he needed to move away from the vehicle the teenagers were in and get to the other side of the bonfire. Forde thought Chavez and his companion were acting like "smart asses." When Chavez got out of the vehicle he was in and walked toward the rear of the vehicle, Forde moved to the opposite side of the bonfire. Forde left the Palms about 5:00 a.m.

### 4. Kowalow

At approximately 5:00 a.m., Kristeen Kowalow saw three young men drive up to the Anchors and Spurs bonfire in a light-colored pickup truck with a camper shell. They appeared to be Hispanic. Two of the young men got out of the vehicle, hung out at the back of their vehicle and began talking to Kowalow. When Kowalow was shown a photographic lineup, she testified that Chavez's photograph looked familiar. The two young men were dressed in baggy clothing, and their attitude made people in Kowalow's group nervous; because of how the two young men made them feel, Kowalow and her friends left the Palms bonfires around 5:00 a.m. When Kowalow left, the only people remaining at the bonfire were two sailors and the three young men in the light-colored pickup truck. The only vehicles left were the light-colored pickup truck and a newer white pickup truck. Kowalow later told investigators the pictures of Ellis and his truck looked familiar.

### 5. Macy

Mary Macy and three friends were also at the Anchors and Spurs bonfire where Ellis had parked his truck. Although defendants' trial took place almost 19 years after the murders, Macy had a distinct memory of Ellis's truck because: "It was brand new, and I was admiring it, that that was the type of truck that I liked, that I would like to buy."

About 5:00 a.m., Macy suddenly realized just about everyone appeared to have left the bonfire party. She had a "bad feeling." Macy told her companions "we need to get out of here. Something is going on." Her companions got into Macy's vehicle. As Macy started to get into the driver's side of her car, a light-colored pickup truck with a camper shell pulled up next to her. Two young men were inside. One rolled a window down, and the two spoke to her in English but with what she believed were Hispanic accents. The two young men made Macy nervous, and she ignored them and left with her

friends. When Macy was leaving, she noticed that only Ellis's brand new truck was still at the Anchors and Spurs bonfire. She did not see Ellis or Combs.

### C. *Crime Scene and Investigation*

Between 7:00 a.m. and 7:30 a.m., a woman and her daughter were searching the Palms area for their son and brother and discovered the bodies of Combs and Ellis. Ellis's new pickup truck was no longer in the area.

### 1. *Examination of Remains*

Ellis's and Combs's bodies were in the dirt about 16 feet apart at the site of an extinguished bonfire. Their bodies were pointed in the same direction, nearly parallel to each other and angled slightly toward each other at the heads.

Ellis was found faceup. There were fresh abrasions and bruises on his face and right lower leg, including a scratch on his face below his eye. There was also an abrasion on the back of his head or upper part of his neck that was not caused by a bullet wound. Ellis's clothing was uncharacteristically disheveled, with his shirt untucked and his belt undone. A USS Constellation ball cap was found lying between Ellis's feet. It was crumpled and had dried vegetation on it, as if someone had stepped on it. Blood was found on the ground on the vegetation near Ellis and on his shirt. He also had dried vegetation stuck to his face. Because of the positioning of the body and location of blood, investigators concluded that he was initially facedown after being shot and had been rolled over onto his back before his body was discovered.[3]

Combs was found lying facedown on the ground, with dirt kicked up on his pant leg and arm.

Post mortem examination of the bodies revealed that each had suffered three fatal gunshot wounds, six shots in total, all fired by a single gun. Ellis had an entrance gunshot wound in his chest; he also had a gunshot wound in his forehead and one in his back. The shot to Ellis's chest was accomplished at a distance. The shot to his head was made at very close range, within approximately an inch. Ellis was alive at the time of each shot.

Combs was shot at close range, from three or four inches away, in the middle of his back close to his spine. This fractured the left side of his spine and rib and

---

[3] At trial, Chavez offered expert testimony that Ellis was facedown for an extended period of time, minutes or hours, before being rolled over.

perforated the aorta and left lung. He was also shot in the top of his head and in his left temple. Two of the projectiles were recovered from his brain. Combs was also still alive when each shot was inflicted, but any one of the wounds would have caused his death within minutes.

The coroner testified that Ellis and Combs died at some point between 1:20 a.m. and 5:20 a.m.

### 2. Crime Scene DNA

At the scene of the killings, on the ground between the bodies and clustered together within several square feet, investigators found various car care accessories that appeared to be from Ellis's truck, including a can of Armor All tire foam, a can of polishing compound, a scrub brush, a map, and a college brochure with Ellis's fingerprints on it. The items were collected by investigators as a single evidentiary item, item 6. A white shoe box was among the items from Ellis's truck identified in item 6, and it appeared the other items in item 6 had, at one point, been in the shoe box.

Within the area where investigators found the items identified in item 6, and near the scrub brush, investigators also found a recently smoked cigarette butt. The butt was from a Marlboro cigarette, the brand Combs smoked. It was collected separately as evidence item 7. The item 7 cigarette butt was 11 feet from Ellis's foot and 17 feet eight inches from Combs's foot. The cigarette butt had ash still attached. Despite many footprints in the area and next to the bodies, no dust, dirt, footprints or tire tracks were on the cigarette butt, leading investigators to conclude it had recently been dropped there. Subsequent DNA testing revealed Elias was a major contributor to DNA found on the item 7 cigarette butt.[4] Additional, more sophisticated DNA testing revealed that the cigarette may have been smoked by as many as two other persons.

A second Marlboro cigarette butt, identified as evidence item 8, was found two feet two inches north of Combs. It had Combs's DNA on it. Like the first cigarette butt with Elias's DNA on it, this second cigarette butt also appeared recently smoked, as it had ash and a bit of paper remaining yet no footprints, dirt or dust on it. This cigarette butt was also believed to have been recently left at the scene.

Investigators also collected DNA touch samples from Ellis's pants pockets. Chavez was found to be a major DNA contributor to those samples.

---

[4] Although investigators collected evidence at the scene for DNA testing, the testing itself did not take place until more than a decade later after testing methods had improved.

Investigators were unable to find either Combs's or Ellis's wallet or their military identification, which they would have needed to return to their Navy base.

### 3. Recovery of Ellis's Toyota Truck

Four days after the murders of Combs and Ellis, Chavez was found driving Ellis's pickup truck in Tijuana, Mexico. Neither the locks nor the ignition had been forced, and the keys were found in the truck. Investigators recovered fingerprints from both Chavez and Elias on various surfaces of the interior and exterior of the truck. Chavez's fingerprints were found on the driver's side door, the driver's side mirror, the rearview mirror, the exterior passenger side cab and front fender, and the front hood. Elias's fingerprints were found on the passenger side door and window, the rearview mirror, the rear sliding window, and the front hood. Elias's fingerprints were also found on a juice bottle in the truck. A red cup was found in the truck as well, and testing showed that both Chavez and Elias were major DNA contributors to samples recovered from the cup. Chavez's DNA was also recovered from a bloody bandage in the truck

### DISCUSSION

### I–V*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### VI

As we have noted, the trial court sentenced Chavez and Elias each to two consecutive terms of life imprisonment, without possibility of parole, plus an additional consecutive year. The trial court initially sentenced Chavez and Elias to life without possibility of parole because it erroneously believed it had no other sentencing options. When advised by the prosecutor that it had discretion to sentence defendants to terms of 25 years to life under section 190.5, subdivision (b), the trial court conducted a further hearing and provided defendants an opportunity to argue and present evidence of mitigating circumstances. At the conclusion of the second sentencing hearing, the court declined to modify defendants' sentences.[8]

---

*See footnote, *ante*, page 18.

[8] In declining to modify its imposition of consecutive life terms without the possibility of parole, the trial court stated: "This is not an easy one, folks. Judges frequently think we need more discretion in the law. Then sometimes having discretion makes this job a lot more difficult.

Relying on *Miller* and *Gutierrez*, Chavez and Elias argue that because they were both juveniles at the time of the murders, the trial court erred in imposing life sentences without the possibility of parole and their cases should be reversed and remanded for resentencing. We agree that *Gutierrez* requires defendants' sentences be reversed and that the trial court must resentence them considering the views expressed in *Miller* and *Gutierrez*.

### A. *Miller*

In *Miller*, the United States Supreme Court considered mandatory life sentences without the possibility of parole imposed on two 14-year-old boys who were responsible for separate murders in separate states. One of the boys, Kuntrell Jackson, was an aider and abettor in the 1999 robbery of a video store in Arkansas during which one of Jackson's two accomplices shot and killed the sales clerk at the video store. After his case was transferred to adult court, Jackson was convicted of felony murder and aggravated robbery

"I said at the [initial] sentencing I'd be hard-pressed to come up with a more callous murder than what these two gentlemen engaged in. To take the life of two young navy men at the prime of their life, fighting with distinction for their country, and to annihilate them execution-style, right through the head, over a truck is about as low as it gets, folks. And I know the family members back there love these two gentlemen, but on the date in question, they couldn't have treated a dog worse than they treated these two young men, and that's a fact. I mean, I have seen hundreds of murders, and this was as callous as you get.

"These defendants had juvenile offenses. This was a classic gang record. Juvenile offenses, repeated juvenile violations prior to this offense. They get away with this crime when it occurs. Do they change their lives? Do they get out and decide, 'Okay, now I'm going to make something out of my life'? Both of these defendants had adult felony offenses, Mr. Chavez for robbery, Mr. Elias for attempted robbery, as well as other offenses, and parole violations. So [the prosecutor] is correct. These are not two gentlemen who had one terrible night and then led a crime-free life after that.

"The flip side is, these two gentlemen have family members and community support that is rare for this court to see, and those of you that have been in my court a lot know that with young people, I tend to try to think about second chances. So I am telling you, I have been wrestling with this one. I have been thinking about it a lot.

"I just think at the end of the day—I could have lived with the juvenile record if after this execution-style double homicide these men had been crime-free, but given the violent crimes after this double homicide, it just doesn't seem right to me. I just—I can't justify it. And I know there has been a hiatus recently in criminality, but I just keep thinking about these two victims and that they were killed young, a young vibrant time in their life, when they had so much of their life to look forward to. And I keep thinking about the one victim's wife. He was a newlywed and his life—his wife's life is over. I mean, we all heard her speak. She'll never be the same mentally, physically. That murder destroyed her existence. And the other victim's family, the mother and father adored that young boy, and they'll never recover from it, their only son.

"So I think at the end of the day, if you look at this supplemental probation report, [the prosecutor] is right. You just can't come up with anything in mitigation, and every single circumstance aggravates the situation. So the court stands by my prior ruling and will decline to modify the sentence."

and, under Arkansas law, the trial court sentenced him to a mandatory life sentence without the possibility of parole. His conviction and sentence were affirmed on appeal. Jackson then brought a state habeas corpus petition in which he argued that, in light of his age at the time of the crimes, the mandatory life sentence without possibility of parole was cruel and unusual punishment. The state trial court dismissed Jackson's petition, and its dismissal was affirmed by the Arkansas Supreme Court.

In 2003, the other 14-year-old boy, Evan Miller, went to a neighbor's house in Alabama with a friend and spent the night smoking marijuana and drinking with the neighbor. Earlier in the evening, the neighbor had made a drug deal with Miller's mother. When the neighbor passed out, Miller attempted to steal the neighbor's wallet; during the attempted theft, the neighbor woke up and started choking Miller. Miller's friend hit the neighbor with baseball bat and, when the neighbor released Miller, Miller picked up the bat and beat the neighbor unconscious. Miller and his friend then set fire to the neighbor's trailer to cover up their crime. The neighbor died from his injuries and smoke inhalation. Miller's case was also transferred to adult court, and he was convicted of murder in the course of arson, which, in Alabama, carries a mandatory sentence of life without the possibility of parole. On appeal, the Alabama Court of Criminal Appeals rejected Miller's argument that, considering his age at the time of the crime, the mandatory life sentence without possibility of parole was cruel and unusual.

The Supreme Court granted certiorari from the judgment dismissing Jackson's state habeas corpus proceeding and from the judgment affirming Miller's conviction and reversed both cases for resentencing. The court found that mandatory life sentences for juveniles offended two strands of the court's sentencing jurisprudence: a group of cases which found that the severe punishments of capital punishment and mandatory life without the possibility of parole in nonhomicide cases, may not be imposed on certain classes of criminals, such as juveniles, perpetrators of nonhomicide offenses, or the mentally retarded (see, e.g., *Graham v. Florida* (2010) 560 U.S. 48, 67–75 [176 L.Ed.2d 825, 130 S.Ct. 2011]; *Kennedy v. Louisiana* (2008) 554 U.S. 407 [171 L.Ed.2d 525, 128 S.Ct. 2641]; *Atkins v. Virginia* (2002) 536 U.S. 304 [153 L.Ed.2d 335, 122 S.Ct. 2242]), because those punishments are disproportionate to the culpability of members of those classes; and a second related line of cases which requires that before capital punishment or its equivalent may be imposed, sentencing authorities must consider the particular characteristics of the defendant and the details of the offense. (*Miller, supra*, 567 U.S. at pp. ___–___ [132 S.Ct. at pp. 2463–2464].)

With respect to the punishment of juveniles, the court stated: " '[Y]outh is more than a chronological fact.' [Citation.] It is a time of immaturity,

irresponsibility, 'impetuousness[,] and recklessness.' [Citation.] It is a moment and 'condition of life when a person may be most susceptible to influence and to psychological damage.' [Citation.] And its 'signature qualities' are all 'transient.' " (*Miller, supra,* 567 U.S. at p. ___ [132 S.Ct. at p. 2467].) The court found its reasoning in *Eddings v. Oklahoma* (1982) 455 U.S. 104 [71 L.Ed.2d 1, 102 S.Ct. 869] "especially on point." (*Miller,* at p. ___ [132 S.Ct. at p. 2467].) "There, a 16-year-old shot a police officer point-blank and killed him. We invalidated his death sentence because the judge did not consider evidence of his neglectful and violent family background (including his mother's drug abuse and his father's physical abuse) and his emotional disturbance. We found that evidence 'particularly relevant'—more so than it would have been in the case of an adult offender. [Citation.] We held: '[J]ust as the chronological age of a minor is itself a relevant mitigating factor of great weight, so must the background and mental and emotional development of a youthful defendant be duly considered' in assessing his culpability. [Citation.]" (*Ibid.*)

Thus, the court found that mandatory life sentences without the possibility of parole were invalid: "Such mandatory penalties, by their nature, preclude a sentencer from taking account of an offender's age and the wealth of characteristics and circumstances attendant to it. Under these schemes, every juvenile will receive the same sentence as every other—the 17-year-old and the 14-year-old, the shooter and the accomplice, the child from a stable household and the child from a chaotic and abusive one. And still worse, each juvenile (including these two 14-year-olds) will receive the same sentence as the vast majority of adults committing similar homicide offenses . . . ." (*Miller, supra,* 567 U.S. at pp. ___–___ [132 S.Ct. at pp. 2467–2468].) In particular, the court found the mandatory character of the life sentences was disproportionate and hence invalid because it deprived the sentencing judge of the opportunity to consider (1) the juvenile's age and its inherent impact on the juvenile's culpability; (2) the juvenile's familial and social circumstances; (3) the circumstances of the homicide offense, including the extent of the juvenile's participation in the offense; (4) the impact of the juvenile's youthfulness on his ability to deal with law enforcement officers and prosecutors as well as effectively assist in his own defense; and (5) "the possibility of rehabilitation even when the circumstances most suggest it." (*Miller,* at p. ___ [132 S.Ct. at p. 2468].)

■ In light of its long-standing views about the diminished culpability of youthful offenders and their heightened capacity for change, the court stated: "[W]e think appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon. That is especially so because of the great difficulty [we have noted] of distinguishing at this early age between 'the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.'

[Citations.] Although we do not foreclose a sentencer's ability to make that judgment in homicide cases, we require it to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." (*Miller, supra,* 567 U.S. at p. ___ [132 S.Ct. at p. 2469], fn. omitted.)

### B. *Gutierrez*

In *Gutierrez,* our Supreme Court considered two juvenile defendants who had been sentenced to life terms without the possibility of parole. In the first case, Andrew Lawrence Moffett participated in an armed robbery. When Moffett and his codefendant were fleeing the scene of the robbery, his codefendant shot and killed a police officer. Moffett was 17 years old at the time of the killing, and he was found guilty of felony murder and sentenced to life without the possibility of parole. In the second case, Luis Angel Gutierrez, who was 17, was living with his aunt and uncle. Early one morning, after his uncle left for work, Gutierrez went into his aunt's bedroom, where, in the course of attempting to rape her, he stabbed her to death. Gutierrez was convicted of murder with a special circumstance finding the murder was committed during a rape or attempted rape. Gutierrez was also sentenced to life without the possibility of parole.

Like Chavez and Elias, Moffett and Gutierrez were sentenced before *Miller* was decided and under the provisions of section 190.5. Section 190.5 gives a trial court discretion to sentence a defendant who is convicted of first degree murder with special circumstances and was between the ages of 16 and 18 at the time of the subject crime to life without the possibility parole or a term of 25 years to life. At the time Moffett and Gutierrez were sentenced, section 190.5 had been repeatedly interpreted as imposing a presumptive sentence of life without the possibility of parole, subject to a determination by the trial court that there was good reason to impose the less severe sentence of 25 years to life. (See *People v. Guinn* (1994) 28 Cal.App.4th 1130, 1141–1142 [33 Cal.Rptr.2d 791] (*Guinn*).)

In *Gutierrez,* the Supreme Court found that the presumption established in *Guinn* was inconsistent with the principles set forth in *Miller.* " 'Treating [life without parole] as the default sentence takes the premise in *Miller* that such sentences should be rarities and turns that premise on its head, instead placing the burden on a youthful defendant to affirmatively demonstrate that he or she deserves an opportunity for parole.' " (*Gutierrez, supra,* 58 Cal.4th at p. 1379.) Because section 190.5 may be construed as creating no presumptive sentence, and such a construction is more consistent with *Miller,* the court overruled *Guinn* and the other cases that had adopted the presumption and held "that section 190.5(b) confers discretion on the sentencing court to

impose either life without parole or a term of 25 years to life on a 16- or 17-year-old juvenile convicted of special circumstance murder, with no presumption in favor of life without parole." (*Gutierrez, supra*, 58 Cal.4th at p. 1387.)

█ The court further held that in considering whether to impose a life sentence without possibility of parole, a sentencing court must consider the five factors enumerated in *Miller*: (1) the inherent impact of the juvenile's age on his culpability; (2) the juvenile's home and family environment; (3) the circumstances of the homicide offense; (4) the juvenile's ability to deal with law enforcement officers and prosecutors as well as effectively assist in his own defense; and (5) the possibility of rehabilitation. (*Gutierrez, supra*, 58 Cal.4th at pp. 1389–1390.)

In considering disposition of both cases, the court in *Gutierrez* presumed that both sentencing courts had followed the law as interpreted by *Guinn* and its progeny and that both courts had therefore erroneously treated a sentence of life without possibility of parole as required by section 190.5, unless good reason to impose the less severe option of 25 years to life existed. (*Gutierrez, supra*, 58 Cal.4th at p. 1390.) The court further found that this presumed error required a remand for resentencing because: "Although the trial courts in these cases understood that they had some discretion in sentencing, the records do not clearly indicate that they would have imposed the same sentence had they been aware of the full scope of their discretion. Because the trial courts operated under a governing presumption in favor of life without parole, we cannot say with confidence what sentence they would have imposed absent the presumption." (*Id.* at p. 1391.) In remanding both cases for resentencing, the court, reiterating *Miller*, stated: "The question is whether each can be deemed, at the time of sentencing, to be irreparably corrupt, beyond redemption, and thus unfit ever to reenter society, notwithstanding the 'diminished culpability and greater prospects for reform' that ordinarily distinguish juveniles from adults. [Citation.]" (*Gutierrez*, at p. 1391.)

C. *Analysis*

Chavez and Elias were both sentenced before either *Miller* or *Gutierrez* was decided. Thus, the trial court did not conduct the analysis required by those cases and imposed sentence at a time *Guinn* compelled a presumption in favor of a life sentence without the possibility of parole.

Although the record may support the trial court's decision to impose life sentences without the possibility of parole, because at the time the sentences were imposed the trial court did not have the benefit of either *Miller* or *Gutierrez* and was bound by the invalid presumption that the life sentences

without the possibility of parole should be imposed,[9] we consider the narrow question of whether the guidance provided by *Miller* and *Gutierrez* would have altered the trial court's sentencing choices.

■ There are circumstances in the record that suggest resentencing, even with the guidance provided by *Miller* and *Gutierrez*, will not lead the trial court to impose a more lenient sentence on either defendant: the trial court found that in first isolating Ellis and Combs, and then, acting together, executing them, defendants were as callous a pair of murderers as she had seen in her lengthy career; although given the opportunity to present evidence in mitigation in the trial court, neither defendant provided information that might limit their culpability or show how commission of these crimes was related to their relative youthfulness and, on appeal, neither suggests that on remand they would be able to provide such mitigating evidence; and finally, the trial court, in apparently determining the murders were less the product of youth than of defendants' malevolent characters, placed a great deal of emphasis on the fact that in the years immediately following the murders, Chavez and Elias continued to lead lives of criminality. These circumstances are independent of the presumption overruled in *Gutierrez* and suggest that, on remand, the trial court, even with the benefit of *Gutierrez*, may impose the harshest possible sentence on defendants.

However, as the court's holding in *Gutierrez* makes plain, before we can affirm these severest of possible sentences for a juvenile crime, we have confidence that the trial court, fully informed of its discretion, would have imposed those sentences. (See *Gutierrez, supra*, 58 Cal.4th at p. 1391.) This leads us to the ultimate question posed by the courts in both *Miller* and *Gutierrez*, which the trial court here must answer: Did these crimes reflect transient immaturity or irreparable corruption? (*Miller, supra*, 567 U.S. at p. ___ [132 S.Ct. at p. 2469]; *Gutierrez*, at p. 1378.) As we read *Miller* and *Gutierrez*, the enumerated factors are not ends in themselves but rather are, when considered together in a reasoned manner, the useful and necessary means by which a sentencing court must determine whether transient immaturity requires some degree of leniency or irreparable corruption must be punished as severely as possible. (See *Miller*, at p. ___ [132 S.Ct. at p. 2469];

---

[9] The record is silent with respect to whether the trial court applied the *Guinn* presumption. As we have noted, under similar circumstances the court in *Gutierrez* applied the presumption that, unless a record otherwise indicates, a trial court knew and followed governing law. (See *Gutierrez, supra*, 58 Cal.4th at p. 1390, citing *People v. Thomas* (2011) 52 Cal.4th 336, 361 [128 Cal.Rptr.3d 489, 256 P.3d 603].) The Attorney General argues that, given the fact that the trial court was initially unaware of the express discretion provided by section 190.5, we should interpret its silence with respect to the presumption as an indication that it was also unaware of the presumption provided by *Guinn* and the cases that followed *Guinn*. We decline to do so. We see no end to the mischief that would arise were we to interpret a completely silent record as indicating that a trial court did *not* follow the law.

*Gutierrez,* at p. 1378.) There is nothing in the record which indicates that the *trial court* itself directly considered this ultimate question. Because the record is silent on this ultimate issue, we cannot say we are convinced as to how the trial court would exercise its discretion and, thus, we are compelled to remand for resentencing.

## VII*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

We reverse imposition of the life sentences without possibility of parole and the parole revocation fines imposed pursuant to Penal Code section 1202.45 and remand for resentencing consistent with the views we have expressed. In all other respects, the judgments are affirmed.

McDonald, J., and Aaron, J., concurred.

The petition of appellant Edward Elias for review by the Supreme Court was denied October 29, 2014, S220971.

---

*See footnote, *ante,* page 18.